IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

UNITED GOVERNMENT SECURITY
OFFICERS OF AMERICA, LOCAL 38,

    Plaintiff,        Case No. CV 04-1858-MO

  v.            OPINION AND ORDER

WACKENHUT CORPORATION,

    Defendants.

**MOSMAN, J.,**

In this arbitration dispute, defendant Wackenhut Corporation asks the court to vacate an arbitration award issued by Arbitrator Carleton Snow ("the arbitrator") between defendant and plaintiff, United Government Security Officers of America, Local No. 38. Plaintiff seeks an order confirming the arbitration award, which ordered defendant to reinstate several discharged employees.

Both parties have filed motions for summary judgment. As set forth below, defendant's motion (doc. #12) is DENIED. Plaintiff's motion (doc. #18) is GRANTED IN PART and DENIED IN PART, and this dispute is REMANDED for further arbitration.

I.   BACKGROUND

The core underlying facts are undisputed. Defendant provides security guards for the federal government at federal offices and other facilities in Oregon and southwest Washington under a contract with the General Services Administration ("GSA"). Plaintiff is the exclusive bargaining representative of Wackenhut guards under the GSA contract. As of August 25, 2003, Dallas Poage, Jeffrey Febus, Michael Wetzel, Ron Miley, and Peter Reyes (collectively, "the guards") were defendant's employees working at Robert Duncan Plaza ("RDP"), a federal office building in Portland, Oregon.

On August 25, 2003, Officer Poage was watching video feed from the Bureau of Land Management ("BLM") taping system and noticed a man and woman having sex on a bench outside the building. Shortly thereafter, the couple moved to another area beyond the range of the BLM camera but within range of a manipulable exterior camera. Poage recorded the incident, informed Officers Febus, Wetzel, Miley, and Reyes of the incident, and showed the officers the recording.

The following day, August 26, 2003, the Federal Protective Service ("FPS") began an investigation of Poage's recording. At the conclusion of its investigation, on September 3, 2003, FPS requested that defendant permanently remove Poage, Febus, and Wetzel from the GSA contract. FPS further requested that defendant remove Miley, Reyes, and guard David Davis from further work at RDP and suspend them from further GSA contract work until they received "professional public relations" training. On September 5, 2003, defendant terminated Poage, Febus, and Wetzel, reassigned Miley, Reyes, and Davis to sites other than RDP, and suspended Miley, Reyes, and Davis until their training was completed.

The guards' employment is governed by a collective bargaining agreement ("CBA") between plaintiff and defendant. Section 5.4 of the CBA provides that "[g]rievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union." Section 5.3 sets forth the steps by which "[a]ll grievances shall be presented and processed." Step 1, the "Informal Step," requires the aggrieved employee to discuss the complaint informally with his or her immediate supervisor. If that discussion fails to resolve the complaint, the grievance may be submitted in writing in accordance with Step 2. Step 2 provides that:

> [i]f the matter is not resolved informally, the employee shall not later than ten (10) days after the informal discussion with the immediate Supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved employee and the Steward, and shall be submitted to the Manager or designee.

Step 3 provides for an appeal of the employer's decision at Step 2. Finally, Section 5.3(D) provides that "[a]ny grievance involving the discharge or other discipline may be commenced at Step 2 of this procedure."

The CBA also contains a "class action" provision that allows for the filing of "group grievances." Section 5.5 provides that "[t]he Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) employee at the Informal Step of the grievance procedure." The CBA is silent regarding how group grievances proceed beyond Step 1.

On September 5, 2003, defendant notified Officers Poage, Febus and Wetzel of their terminations. Union steward Ron Mikell was present at that meeting and informally protested these terminations and the disciplinary actions against Officers Reyes and Wetzel. On

PAGE 3 - OPINION AND ORDER

September 10, 2003, plaintiff filed a formal group grievance, signed by Mikell, alleging defendant's actions violated the CBA. Defendant denied the grievance because the officers had not individually submitted signed statements of their grievance, as defendant claimed was required under Step 2 of the grievance procedure. Plaintiff responded that individual signed statements were unnecessary because it had filed a group grievance pursuant to Section 5.5 of the CBA.

The dispute proceeded to arbitration on July 8, 2004. At arbitration, defendant maintained that the dispute was not properly submitted to arbitration because the grievants failed to comply with Step 2 of Section 5.3 of the CBA. Defendant further argued that the grievants could not be reinstated because GSA and FPS have total authority to dismiss or suspend the guards under the GSA contract.

On November 1, 2004, the arbitrator found the grievance arbitrable and concluded that defendant did not have just cause to terminate or suspend the guards. The arbitrator ordered that the guards be reinstated and made whole for all harm suffered as a result of the CBA violation. The arbitration award failed to consider defendant's argument that GSA and FPS have total authority to dismiss or suspend the grievants under the GSA contract and the CBA. Jurisdiction over the matter was to remain with the arbitrator for 60 days.

On November 12, 2004, defendant notified plaintiff that it would not comply with the award and would seek vacatur. On November 18, 2004, the arbitrator died without having responded to the post-arbitration briefs.

II.   DISCUSSION

   A.   Applicable Law

The Ninth Circuit has identified four grounds supporting vacatur of an arbitration decision resolving a labor dispute: (1) the award does not draw its "essence" from the CBA and thus the arbitrator effectively dispensed "his own brand of industrial justice," (2) the arbitrator exceeded the boundaries of the issues submitted for decision, (3) the award is contrary to public policy, or (4) the award was procured by fraud.  Southern Calif. Gas Co. v. Utility Workers Union of Am., 265 F.3d 787, 792-93 (9th Cir. 2001).

Arbitrators generally are "not bound by the four corners of the [CBA]."  Phoenix Newspapers, Inc. v. Phoenix Mailers Union, Local 752, 989 F.2d 1077, 1081 (9th Cir. 1993).  In determining the contours of the CBA, arbitrators may draw from a wide array of sources including "statutes, case decisions, principles of contract law, practices, assumptions, understandings, the common law of the shop and the industrial common law."  Hawaii Teamsters Local 996 v. United Parcel Serv., 241 F.3d 1177, 1184 (9th Cir. 2001); see also United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960) (observing arbitrators may "look for guidance from many sources").

As stated, however, a district court must vacate an arbitrator's decision if the arbitrator "dispensed his own brand of industrial justice by making an award that does not draw its essence from the collective bargaining agreement."  Hawaii Teamsters, 241 F.3d at 1181 (citation omitted); see also Enterprise Wheel, 363 U.S. at 597 ("[An arbitrator's] award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement

of the award."). Thus an arbitrator has no discretion to ignore the plain language of the CBA, instead following "his own whims and biases." Hawaii Teamsters, 241 U.S. at 1181. But as long as an honest arbitrator is "'even arguably construing or applying the contract and acting within the scope of his authority,' the fact that a 'court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Assoc. Coal, 531 U.S. at 62 (quoting Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987)).

Under Ninth Circuit case law, the arbitrator is deemed not to have been construing or applying the CBA if his interpretation fails to qualify as a "plausible interpretation of the contract." Phoenix Newspapers, 989 F.2d at 1080, 1083; accord SFIC Props, Inc. v. District Lodge No. 94, 103 F.3d 923, 924 (9th Cir. 1996). Stated differently, an arbitrator's award is reversible when the arbitrator "'manifestly disregard[ed]' the contours of the agreement." Phoenix Newspapers, 989 F.2d at 1081 (quoting Stead Motors of Walnut Creek v. Auto. Machinists Lodge, No. 1173, 886 F.2d 1177, 1205 n.6 (9th Cir. 1989) (*en banc*)); see also United Food & Commercial Workers v. Foster Poultry Farms, 74 F.3d 169, 173 (9th Cir. 1996) ("A court must limit its review to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement."). Thus although an arbitrator "may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions." S.D. Warren Co. v. United Paperworkers Int'l Union, 815 F.2d 178, 182 (1st Cir. 1987) (citation omitted), vacated on other grounds by 484 U.S. 983 (1987), on remand, 845 F.2d 3 (1st Cir. 1988).

B.  Analysis

1.  Arbitrability

Defendant argues the grievance was not properly before the arbitrator because the individual grievants did not submit signed statements of facts, as required by Step 2 of the grievance procedure. Rather, the Union submitted a joint statement of facts on behalf of the group of grievants. Defendant argues strict compliance with Step 2 is a condition precedent to arbitration, noting that Section 5.4 twice states that only "[g]rievances processed in accordance with the requirements of Section 5.3 . . . may be processed to arbitration." Defendant argues the arbitrator therefore dispensed "his own brand of industrial justice" by failing to honor the CBA's express terms.

The arbitrator determined the CBA was ambiguous regarding whether Step 2 required individual employees to sign statements of facts when their grievances were submitted as a group grievance pursuant to Section 5.5. By allowing group grievances to be filed at Step 1, Section 5.5 effectively amends Section 5.3(A) by substituting the Union for the aggrieved employee. The CBA is silent regarding what happens next to group grievances. Defendant argues that because Section 5.5 references only group grievances "at the Informal Step of the grievance procedure," group grievances that proceed beyond Step 1 must be pursued individually, such that each aggrieved employee must sign a statement of facts to comply with Step 2. The arbitrator determined, however, that the Union may proceed through the subsequent stages of the grievance procedure as a representative of the class of aggrieved employees. Thus the arbitrator concluded, in essence, that Section 5.5 amends Step 2 in a similar fashion to its amendment to Step 1, such that the Union may submit a statement of facts for the entire class,

PAGE 7 - OPINION AND ORDER

signed by the Union representative.

Whatever the wisdom of the arbitrator's interpretation of the CBA, it cannot be said that it manifestly disregarded the contract's terms. Rather, the arbitrator's decision represents a plausible reading of the interplay between Sections 5.5 and 5.3 of the CBA. See, e.g., United Food, 74 F.3d at 173 (vacatur not appropriate where "the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement."). Accordingly, vacatur is not appropriate on this basis.

        2.    **Merits**

It is undisputed that the federal government exercises complete control over the grant or termination of security clearances for defendant's employees, and that the government may require dismissal, suspension or retraining of any of defendant's employees. It is also undisputed that FPS directed defendant to terminate and suspend the five grievants in the underlying dispute. Defendant argued to the arbitrator that it was therefore absolutely precluded from reinstating the grievants to their former positions. Nevertheless, the arbitrator ordered the grievants' reinstatement without considering this argument, and died before having a chance to consider post-hearing briefing on this subject. Accordingly, the arbitrator's decision that defendant must reinstate the grievants to their former positions is remanded for further arbitration by another arbitrator selected pursuant to the CBA.

**III.    Conclusion**

For the foregoing reasons, defendant's motion for summary judgment (doc. #12) is denied. Plaintiff's motion for summary judgment (doc. #18) is denied to the extent it seeks confirmation of the arbitration award, and therefore reinstatement of the aggrieved employees.

However, plaintiff's motion is granted to the extent it seeks remand for further arbitration. On remand, the arbitrator should not revisit Arbitrator Snow's determination that the dispute was arbitrable, but should reconsider the merits of the dispute in light of FPS' and GSA's authority to dismiss or suspend the guards under the GSA contract.

IT IS SO ORDERED.

DATED: Portland, Oregon, August  29 , 2005.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge